IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TEMSA ULASIM ARACLARI SANAYI VE TICARET A.S., <br><br>*Plaintiff*, <br><br>v. <br><br>CH BUS SALES, LLC; <br><br>*Defendant*. | Civ. No. 18-698-RGA |

**MEMORANDUM**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Temsa Ulasim Araclari Sanyi Ve Ticaret A.S. ("Temsa") has moved for a Temporary Restraining Order and Preliminary Injunction against Defendant CH Bus Sales, LLC ("CH Bus"). (D.I. 20). For the reasons set forth below, the motion for a temporary restraining order is granted in part and denied in part. The motion for preliminary injunction will be decided after discovery and a separate hearing.

**I.  BACKGROUND**

   **A. Governing Contracts**

Temsa manufacturers motorcoaches sold worldwide. (D.I. 21 at 2). In February 2010, Temsa and CH Bus entered into a Distribution Agreement, by which CH Bus became the exclusive distributor and servicer of Temsa motorcoaches in the United States, Canada, Guam, and the Commonwealth of Puerto Rico. (D.I. 1-1, Ex. A to Ex. A, § 1.1). The Distribution Agreement, as amended, requires CH Bus to remit payment for the motorcoaches to Temsa by cash or wire transfer within ninety (90) days of the bill of lading or the time of sale, if sold earlier. (*Id.* at § 4.5;

1

D.I. 1-1, Ex. B to Ex. A). Finally, the Distribution Agreement provides that any unresolved disputes "arising under this Agreement" shall be submitted to arbitration to be held in New York. (*Id.* at § 17.3).

In January 2016, CH Bus and Temsa entered into a Security Agreement that granted Temsa a security interest in each motorcoach "sold ... to date" and each motorcoach "sold hereafter." (D.I. 1-1, Ex. D to Ex. A, Recitals). The security interest secures CH Bus's "Payment Obligation," which is the obligation of CH Bus "to pay the full purchase price for each [motorcoach] pursuant to the terms of the Distribution Agreement." (*Id.*). The Security Agreement further provides that Temsa holds the security interest in, and retains title to, each motorcoach "until [Temsa] shall have been paid in full" for that motorcoach. (*Id.* at § 1(a)). Any breach of any Payment Obligation constitutes "an event default" that gives Temsa "all rights and remedies available at law or in equity," including its rights as a secured party under the Uniform Commercial Code. (*Id.* at § 1(f)). The Delaware Uniform Commercial Code provides, "After default, a secured party may take possession of the collateral." 6 *Del. C.* § 9-609(a)(1). There does not appear to be any arbitration clause in the Security Agreement.

### B. Motorcoaches At Issue

Temsa claims that, to date, CH has failed to remit payment for 74 motorcoaches. (D.I. 22 at ¶ 9). The 74 motorcoaches fall into two groups: (i) 41 motorcoaches Temsa financed directly pursuant to the Security Agreement; and (ii) 33 motorcoaches financed by Turkiye Ihracat Kredi Bankasi A.S., also known as Turk EximBank ("EximBank"). (D.I. 22 at ¶ 6). According to Temsa, CH Bus defaulted under its agreement with EximBank, Temsa satisfied the debt CH Bus owed to EximBank, and EximBank assigned its rights to Temsa. (D.I. 21 at 1 n. 1). Neither EximBank's

2

contract with CH Bus nor EximBank's assignment agreement with Temsa are in the record.[1] Other facts about when and why the assignment occurred are also not in the record. Nevertheless, Temsa's counsel represented at the hearing that EximBank financed only 80% of the purchase price for each motorcoach, leaving CH Bus responsible for paying Temsa directly for the remaining 20%. Because the Security Agreement provides that Temsa retains a security interest in the motorcoach until it is paid in full for that motorcoach, Temsa asserts that it has a security interest in the 33 motorcoaches financed by EximBank, because CH Bus never remitted payment to Temsa for the remaining 20%.[2] Finally, Temsa believes that CH Bus has unlawfully disposed of 57 of the 74 motorcoaches.[3] (D.I. 21 at 6-9).

C. **Procedural History**

On March 22, 2018, Temsa filed a demand for arbitration against CH Bus with the American Arbitration Association. (D.I. 5-1, Ex. C). The arbitration demand asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, and an accounting. (*Id.*). On April 9, 2018, Temsa sued CH Bus in the Delaware Court of Chancery, asserting claims for declaratory judgment, specific performance, and a constructive trust. (D.I. 1-1, Ex. A at ¶¶ 15-40). Based on the representations of Temsa's

---

[1] Temsa has submitted an August 2, 2018 letter EximBank sent CH Bus notifying it of the assignment. (*See* D.I. 22-2, Ex. B).

[2] Because of the assignment, Temsa's security interest in the remaining 80% of each motorcoach financed by EximBank is presumably subject to: "(1) all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and (2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee." *See, e.g.*, 6 *Del. C.* § 9-404.

[3] According to Temsa, 18 of the 41 motorcoaches financed by Temsa were leased to third parties; 6 of the remaining 23 motorcoaches financed by Temsa were missing at the time of inspection, and all 33 of the motorcoaches financed by EximBank were sold. (D.I. 21 at 6-9).

3

counsel, it appears that Temsa is asking the court to issue an order that will prevent the loss or destruction of the motorcoaches that serve as collateral until the arbitration is resolved. CH Bus has answered the complaint and filed counterclaims for breaches of contract and tortious interference. (D.I. 26).

## II. DISCUSSION

A party seeking a temporary restraining order must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief. *KOS Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir.2004); *QVC, Inc. v. Your Vitamins, Inc.*, 714 F. Supp. 2d 291, 297 (D. Del. 2010). In addition to disputing whether Temsa has satisfied each of these four factors, CH Bus has raised two equitable defenses: laches and unclean hands. (D.I. 27 at 6-7, 14-15). Finally, if a temporary restraining order does issue, CH Bus has requested that Temsa post a bond. (*Id.* at 15). "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Globus Med., Inc. v. Vortex Spine, LLC*, 605 Fed. Appx. 126, 129 (3d Cir. 2015) (quoting Fed. R. Civ. P. 65(c)). The court will address each of these issues in turn.

### A. Injunction Standard

**Success on the Merits.** Because the facts upon which Temsa asserts a security interest in the 33 motorcoaches financed by EximBank are not currently in the record, Temsa cannot show at this time that is likely to succeed on the merits with respect to those motorcoaches. The court recognizes that an amended complaint combined with some evidence may remedy this defect and

4

grants leave for Temsa to file such a complaint if it chooses. As for the 41 motorcoaches financed by Temsa, Temsa has shown a likelihood of success on the merits. Temsa has established the existence of a valid contract (the Security Agreement) giving it the right to take immediate possession of a motorcoach if CH Bus has not been paid in full for that motorcoach within 90 days. (D.I. 1-1, Ex. A to Ex. A, § 4.5; D.I. 1-1, Ex. D to Ex. A at § 1). CH Bus has not disputed Temsa's assertion that it has not remitted payment for those 41 motorcoaches financed pursuant to the Security Agreement. Thus, Temsa has shown that it likely has the right to take possession of those 41 motorcoaches.

**Irreparable Harm.** As a general matter, "a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement." *Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236, 255 (3d Cir. 2011). The rule, however, is not absolute. "Where secured creditors (under the UCC or otherwise) seek court intervention to maintain their position, the prospective loss of their status quo security interest has been held sufficient to constitute the irreparable harm needed to justify an injunction." *Plainfield Specialty Holdings II Inc. v. Children's Legal Services PLLC*, 634 F. Supp. 2d 833, 846 (E.D. Mich. 2009) (collecting cases); *see also State Farm Mut. Auto. Ins. Co. v. American Rehab & Physical Therapy, Inc.*, 376 F. App'x 182, 184 (3d Cir. 2010) (finding irreparable harm where defendant "would continue to conceal assets ... in a manner that would further evade [plaintiff's] collection efforts"); *WM Capital Partners I, LLC v. BBJ Mortg. Services, Inc.*, 2010 WL 5903262, at *2–3 (E.D. Mich. Aug. 17, 2010) ("[N]otwithstanding the general rule, a plaintiff with a secured interest in a defendant's assets may obtain preliminary injunctive relief if there is a risk that the collateral will be impaired or depleted.").

Here, Temsa has demonstrated a sufficient threat to its security interest to warrant a preliminary injunction. CH Bus has not been forthcoming about the current location of all 74 motorcoaches. (D.I. 21 at 6-12). When CH Bus finally made 23 motorcoaches available for inspection, they were not located at one of the four addresses mandated by the Security Agreement. (*Id.*; *see also* D.I. 1-1, Ex. D to Ex. A, at § 1(c)(iii)). On the day of the inspection, the motorcoaches were not even located at the address CH Bus provided. (D.I. 21 at 6-12). When CH Bus finally provided the correct address, 6 of the 23 motorcoaches were missing and remain unaccounted for. (D.I. 21 at 6-12). Temsa states that the lot where the motorcoaches are currently stored is not secure. The motorcoaches are highly mobile, making them easily susceptible to concealment. (*Id.* at 4-5). Finally, with the passage of time, and use by CH Bus, the motorcoaches which serve as collateral will depreciate in value.[4] (*Id.* at 13).

**Balance of Hardships.** The balance of hardships favors an injunction because it would simply maintain the status quo. *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 729 (3d Cir. 2004); *Playboy Entertainment Group, Inc. v. United States*, 918 F. Supp. 813, 822 (D. Del. 1996). The court is not persuaded by CH Bus' argument that the balance of hardships weighs in its favor, because the potential damages award it may recover on the counterclaims exceeds the value of the collateral. (D.I. 27 at 12). The Distribution Agreement expressly prohibits any offsets against the payments CH Bus owes to Temsa. Specifically, Section 4.7 states, "In making payments to [Temsa] under the terms of this Agreement, no deductions for warranty or any other claims against [Temsa] shall be made unless [CH Bus] receives from [Temsa] its prior written

---

[4] In support of its irreparable harm argument, Temsa raises the possibility that CH Bus' current financial state and inability to make its payments to date indicate that Temsa may never get paid. (D.I. 22 at 11). CH Bus disputes any assertion that it is not in a strong financial position. (D.I. 27 at 11). The record on this point is somewhat vague but, in the end, I am not now convinced of Temsa's claims regarding CH Bus' financial position.

approval therefor." (D.I. 1-1, Ex. A to Ex. A, § 4.7). Counsel for Temsa represented that it has not given any prior written approval for CH Bus to offset any payments it owes to Temsa.

**Public Interest.** There is a public interest in the enforcement of security agreements, because "secured transactions facilitate credit by protecting the secured party while allowing the debtor to make productive use of the collateral." *Gen. Elec. Capital Corp. v. Alliance Transp. Grp. LLC*, 2009 WL 10702069, at *3 (N.D. Ill. Feb. 13, 2009); *Foley & Lewis Racing, Inc. v. Torco Racing Fuels, Inc.*, 2009 WL 22860, *2 (E.D. Mich. Jan. 5, 2009) ("[U]pholding the rights of ... secured parties to repossess collateral without awaiting the resolution of unsecured creditor claims is in the best interest of our credit-based economy."); *Libeau v. Fox*, 880 A.2d 1049, 1056–57 (Del. Ch. 2005) ("[T]he wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations."). Thus, Temsa satisfies the fourth factor for granting a TRO.

### B. Equitable Defenses

CH Bus asserts the equitable defense of laches and unclean hands. (D.I. 27 at 6-7, 14-15). The court does not find either defense persuasive. "Laches is not determined by the mere passage of time." *Nevins v. Bryan*, 885 A.2d 233, 253–54 (Del. Ch. 2005). Instead, there must be an unreasonable delay that is prejudicial to the defendant. *Khanna v. McMinn*, 2006 WL 1388744, at *30 (Del. Ch. May 9, 2006). CH Bus has shown neither an unreasonable delay nor prejudice. It has merely pointed to number of months between the date the dispute first arose and the date Temsa filed its motion for injunctive relief, during which time the parties worked unsuccessfully to settle their disputes. (D.I. 27 at 6-7). There is nothing unreasonable about trying to resolve a dispute without excessive or unnecessary litigation.

"The equitable doctrine of unclean hands bars litigants who have acted inequitably from seeking what might otherwise be available relief." *Tafeen v. Homestore, Inc.*, 2004 WL 556733, at *6 (Del. Ch. Mar. 22, 2004). On the record currently before the court, CH Bus has not shown the likelihood of an unclean hands defense. According to CH Bus, Temsa stopped warranty reimbursement payments, prevented the sale of a non-Temsa product, prevented the acquisition of another product line, stopped shipping motorcoaches, and started selling motorcoaches directly. (D.I. 27 at 3-4, 15). These acts, if proven true, may be a breach of contract, but that does not mean they necessarily rise to the level of inequitable conduct. More importantly, it appears that some of Temsa's actions may have been permitted under the terms of the various contracts. (*See, e.g.*, D.I. 1-1, Ex. A to Ex. A, § 1.1 (stating that "[Temsa] may sell directly ... to those customers in the Territory"); *Id.* at § 2.1.3 ("[CH Bus] shall refrain from ... offering for sale ... any third-party ... products which serve the same function as [Temsa's products]."); *Id.* at § 4.13 ("[Temsa] may suspend the supply of Products to [CH Bus] for so long as [CH Bus] is in breach of its material obligations under this Agreement...."). Thus, CH Bus has not shown any likelihood that Temsa has unclean hands on the current record.

### III. CONCLUSION

For the foregoing reasons, Temsa Motion for a Temporary Restraining Order and Preliminary Injunction is granted in part and denied in part. The motion for a temporary restraining order is granted with respect to the 41 motorcoaches financed directly by Temsa. The motion for a temporary restraining order is denied with respect to the 33 motorcoaches financed by

EximBank. The motion for a preliminary injunction is held in abeyance.

An appropriate order will be entered.

Dated: August 31, 2018

_____
UNITED STATES DISTRICT JUDGE